IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| JAIME FRANCES RYAN,<br><br>                    Plaintiff,<br><br>vs.<br><br>ANDREW SAUL, Commissioner of<br>Social Security,<br><br>                    Defendant. | CV 19-61-BLG-TJC<br><br><br>**ORDER** |

Plaintiff Jaime Frances Ryan ("Ryan") filed a complaint pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner") regarding the cessation of Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  (Docs. 1; 9 at 10, 12-14.)  The Commissioner subsequently filed the Administrative Record ("A.R.").  (Doc. 7.)

Presently before the Court is Ryan's motion for summary judgment, seeking reversal of the Commissioner's denial of continuance of benefits.  (Doc. 9.)  The motion is fully briefed and ripe for the Court's review.  (Docs. 9-11.)

For the reasons set forth herein, and after careful consideration of the record and the applicable law, the Court finds this matter should be **REMANDED** for further proceedings.

1

## I.    PROCEDURAL BACKGROUND

On June 29, 2012, Ryan was initially found disabled since April 15, 2010. (A.R. 101-111.)  On August 3, 2016, however, the Social Security Administration ("SSA") determined that Ryan was no longer disabled as of August 1, 2016.  (A.R. 17.)  Upon reconsideration, a state agency disability hearing officer upheld the decision.  (*Id.*; *see* A.R. 130.)  Ryan then requested a hearing before an Administrative Law Judge ("ALJ"), and a hearing was held February 23, 2018. (A.R. 17.)  On July 5, 2018, the ALJ determined that Ryan was no longer disabled as of August 1, 2016.  (A.R. 17-31.)  Ryan requested review of the ALJ's decision, which the Appeals Council denied.  (A.R. 1.)  Thereafter, Ryan filed the instant action.  (Doc. 1.)

## II.    LEGAL STANDARDS

### A.    Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The Court must affirm the Commissioner's decision unless it "is not supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  *See also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may reverse the ALJ's decision to deny benefits only if it is based upon legal error or is

not supported by substantial evidence"); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten*, 44 F.3d at 1457. In considering the record, the Court must weigh both the evidence that supports and detracts from the ALJ's conclusions. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975). The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary."). However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (quoting *Tackett v. Apfel,* 180 F.3d 1094, 1097 (9th Cir. 1999)).

3

### B.     Determination of Continuing Disability

As noted above, Ryan was initially found to be disabled in a decision issued on June 29, 2012.  Following that determination, the Commissioner is required to periodically review continued entitlement to benefits.  20 C.F.R. §§ 404.1594(a).  Disability benefits can be terminated if: (1) there has been medical improvement in the claimant's impairments, and (2) the medical improvement is related to the claimant's ability to work.  20 C.F.R. §§ 404.1594(a), 416.994(b).  Medical improvement is defined as "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled."  20 C.F.R. §§ 404.1594(b)(1).

Here, the most recent favorable medical decision finding Ryan disabled is the decision dated June 29, 2012.  (A.R. 19.)  In conducting a medical improvement analysis, this decision is referred to as the "comparison point decision," or CPD.  (*Id.*)

Medical improvement "is determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs, or laboratory findings associated with that impairment(s)."  20 C.F.R. §§ 404.1594(c)(1).  Even where medical improvement related to the claimant's ability to work has occurred, the Commissioner must also show that the

claimant is currently able to engage in substantial gainful activity before a finding of no longer disabled.  20 C.F.R. §§ 404.1594(a), (b)(3).

The Commissioner makes the assessment of continuing disability through an eight-step evaluation process under 20 C.F.R. § 404.1594(f).  The Commissioner must determine: (1) whether the claimant is engaging in substantial activity; (2) if not, whether the disability continues because the claimant has an impairment or combination of impairments which meets the criteria of a listed impairment; (3) whether medical improvement has occurred; (4) if there has been medical improvement, whether the medical improvement is related to the claimant's ability to do work; (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether an exception to medical improvement applies; (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all the current impairments in combination are severe; (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform past relevant work; and (8) if the claimant is unable to perform past work, whether other work exists in significant numbers that the claimant can perform.  20 C.F.R. §§ 404.1594(f).

/ / /

/ / /

5

### III.   FACTUAL BACKGROUND

#### A.   Hearing

Ryan claims to be disabled based upon a number of physical impairments and conditions, most prominently degenerative disease of the lumbar and cervical spine.  At the hearing before the ALJ, Ryan testified she was able to lift five to ten pounds despite weak arms, especially her right arm, and pain in her neck, which caused incapacitating headaches 3-4 times a week and required cervical injections. (A.R. 53-54, 55-56.)  Ryan further described her lack of feeling in her right hand, and constant pain pre- and post-operation to her hand from a severe laceration. (A.R. 55.)  Ryan also explained that she could only walk for "about 10 minutes" before experiencing pain and needing to stop.  (A.R. 56.)  Ryan stated that she uses a cane for stability, though it was not prescribed.  (*Id.*)  Ryan further explained she started using the cane because she fell or tripped before and experienced stabbing pain, making her legs go "real weak."  (A.R. 57.)  Ryan said she can only stand for about 15 minutes with a cane and sit for 15-20 minutes: "I can never get through a normal show."  (*Id.*)  Ryan stated she has pain in her lower spine when she sits. (A.R. 58.)  She also affirmed that she has numbness in the legs and must lay down 3 to 4 times a day for one-half hour at a time because she cannot sit or stand.  (*Id.*)

Ryan further discussed the medications she takes and their side effects, namely nausea, vomiting, and dizziness.  (A.R. 59.)  Ryan stated she vomits at

6

least once a day and is nauseous and dizzy at least half the day, even when she takes her medication with food.  (*Id.*)  Ryan testified that she can only drive to pick up her kids or go to the mailbox "sometimes" because of the dizziness and low blood sugar.  (*Id.*)  Ryan also said her medications cause issues with blood pressure, and that steroid injections have caused problems with her blood sugar.  (A.R. 60.)

Ryan next testified about her struggles with bladder and fecal incontinence after her surgeries.  (*Id.*)  Ryan clarified that while her fecal incontinence had improved since surgery, her urinary incontinence had not.  (*Id.*)  Ryan stated that she wears Depends, "a kind of pad," but most times she can get to the bathroom.  (*Id.*)  When she goes camping, she requires a potty chair or a bathroom close by.  (*Id.*)  In sum, Ryan testified that her pain and nausea most interferes with her ability to work.  (*Id.*)

Ryan also confirmed her education level (10th Grade), her history of ADD, and her failed attempts at passing the GED: "I tried several times … Maybe 5-6."  (A.R. 61.)

The ALJ further questioned Ryan about her ability to go camping and history of ankle issues.  (*Id.*)  Ryan first testified that she does not haul firewood, nor do any of the physical work related to camping.  (A.R. 52-53, 61).  While camping, she is able to stand, sit and lay down on a waist-high, queen-size bed, as

needed.  (A.R. 52-53.)  With respect to her ankle, she said that she has had four or five ankle surgeries since an accident in 1996.  (A.R. 61-62.)  The ALJ also confirmed Ryan's asthma and her anxiety around crowds.  (A.R. 63-64.)  Ryan said she uses an albuterol inhaler for her asthma 4-6 times per day.  (A.R. 63.)  Ryan said she is not currently taking medications for her anxiety because "I'm allergic to sulfamides and they put a lot of that in medications with it."  (A.R. 64.)

### B.    Medical Evidence

The Administrative Record includes Ryan's medical records from several health care providers, inclusive of the period between the comparison point decision date, June 29, 2012 and August 1, 2016, when the ALJ found Ryan no longer disabled.  The medical records indicate Ryan had extensive chronic healthcare issues during this period.  (*Cf.* A.R. 1208-09 and 1370, *e.g.*)

### 1.    *Stefanie Lange, M.D.*

Stefanie Lange, M.D., of Community Health Partners, has been Ryan's primary care and treating physician since July 2011.  (A.R. 873.)  The first record of Dr. Lange in the administrative record documents her opinion that Ryan "has severe low back pain associated with severe degenerative disc disease, for which she is scheduled for surgery in August."  (*Id.*)  Lange further opined that Ryan "is unable to sit or stand for more than an hour at a time."  (*Id.*)

During the first year of the patient-physician relationship, Dr. Lange treated Ryan for a left knee injury, hand laceration, ankle injury, diabetes, and anxiety; prescribed and monitored medications; and referred her to various specialists, such as orthopedics and physical therapy.  (*See e.g.* A.R. 952-954, 955-958, 962-964, 971-988.)  Between 2012 and 2016, Lange diagnosed or treated Ryan for asthma, cervical radiculopathy, degenerative joint disease, and diabetes mellitus type 2, and oversaw her recovery for surgeries relating to her back and uterus.  (*See e.g.* A.R. 1095, 1097.)  During this period, Ryan was prescribed multiple medications for her various conditions.  (*See e.g.* 973, 1094, 1099.)  By the onset date of August 1, 2016, Lange's records show that Ryan was additionally diagnosed with idiopathic kyphoscoliosis, post-traumatic arthritis of the right ankle, and chronic radicular lumbar pain.  (A.R. 1208.)

On September 12, 2016, Lange examined Ryan and provided a treating source statement addressing the history of Ryan's disability, and her assessment of Ryan's current condition.  (A.R. 1212-1217, 1255.)  In Lange's opinion, Ryan's ability to work had not improved over the past few years as she continued to experience chronic pain relating to cervical disc disease with radicular symptoms; lumbar disc disease with radicular symptoms; and persistent right neck pain with radiation to the right shoulder down the arm resulting in numbness and tingling in the hand.  (A.R. 1212.)  Lange further noted Ryan's chronic ankle pain and

9

instability following a distal tibia/fibula fracture.  (*Id.*)  Lange observed increased

pain with heavy lifting, repetitive motion, twisting, bending, and sitting or standing

for extended periods.  (*Id.*)  Lange also noted Ryan is seeing "neurosurgery" for

her back and neck, with possible surgical treatment in the future, and orthopedics

for her shoulder.  (*Id.*)  Ryan attended physical therapy for both issues.  (*Id.*)

Lange also noted, however, that Ryan has a moderate activity level, including

walking and cycling with daily exercise.  (A.R. 1214.)

### 2.    *Rex Spear, M.D.*

Dr. Spear is a radiologist to whom Dr. Lange referred Ryan for an MRI of

the cervical spine in September 2016.  (A.R. 1223.)  Spear found mild to moderate

degenerative disc disease with slight disc bulging at C4-C5, and advanced

degenerative disc disease with circumferential disc bulging and endplate spurring

at C5-C6.  (*Id.*)  Spear also noted "moderately" and "fairly" prominent canal

stenosis and neural foraminal narrowing progressing mildly, as well as resultant

gentle curving kyphosis.  (*Id.*)

### 3.    *Alan Dacre, M.D.*

Dr. Dacre is an orthopedic surgeon to whom Community Health Partners

referred Ryan in June 2011.  (A.R. 864.)  At her first visit, Ryan's chief complaint

was low back pain and weakness in her right leg.  (*Id.*)  Dacre's initial impression

was that Ryan suffered from severe degenerative disc disease L5-S1 "most likely

from the post discectomy degeneration." (*Id.*)  Dacre subsequently ordered Ryan to undertake physical therapy post-surgery for L5-S1 anterior interbody fusion, foraminotomy.  (A.R. 950.)

By June 2016, physical therapy had helped Ryan's cervical spine, but she continued to have some neck pain, with overall improvement.  (A.R. 1180, 1181-1182.)  Low back pain was intermittent and radiated into her left anterior thigh and hip.  (*Id.*)  Ryan placed her back pain at a 7 of 10, and neck pain 5 of 10.  (*Id.*)  Range of motion was "fairly good" in her cervical spine and strength in upper extremities within normal limits.  (A.R. 1181.)  Dacre recommended continued physical therapy for her cervical spine and added lumbar core stabilization exercises for 6 to 8 weeks before transitioning into a home exercise program.  (A.R. 1182.)

Ryan again followed up with Dr. Dacre in September 2016, during which she rated her neck and arm pain at 7-8 of 10.  (A.R. 1191.)  Dacre reviewed an MRI of Ryan's back, noting broad-based disc bulge and moderate cervical spinal stenosis at the C5-C6 level, with moderate to severe degenerative disc disease.  (A.R. 1192-1193.)  Dacre hypothesized that Ryan's symptoms were possibly derived from her cervical spine, but that Ryan did have Tinel's over the right cubital tunnel and carpal tunnel.  (A.R. 1193.)  Dacre remarked further testing was

needed to distinguish between peripheral nerve entrapments versus cervical radiculopathy.  (*Id.*)

In January 2017, Ryan saw Dr. Dacre for left-sided low back and leg pain, which she rated 7 of 10 and 7-8 of 10, respectively.  (A.R. 1283.)  Ryan emphasized her pain was worse while sitting and had difficulty sitting for any length of time, requiring her to lie on her right side or walk to stay comfortable. (*Id.*)  During the lumbar spine exam, Dacre observed a normal gait, normal coordination, normal posture, no abnormal pain behaviors, and no muscle spasms. (A.R. 1284-1285.)  Dacre reviewed two images of Ryan's lumbar spine and compared them to imaging from February 2013, noting "progression of L2-3 and L3-4 disc degeneration which is quite significant," as well as "a solid interbody fusion at L5-S1 at the previous ALIF site."  (A.R. 1286.)  Dacre's impression was that Ryan had disc degeneration at the L2-L3 and L3-L4 with positive femoral nerve stretch on the left, where pain is the majority of the issue.  (*Id.*)  A lumbar MRI was then ordered.  (*Id.*)

Dr. Dacre saw Ryan again in February 2017, focusing on the January MRI of her lumbar back.  (A.R. 1280-1282.)  Ryan rated her back pain an 8 of 10, and her leg pain a 7 of 10.  (A.R. 1280.)  In reviewing the MRI, Dacre noted it "demonstrates mild disc desiccation at the L4-L5 level with a broad-based disc bulge without significant central spinal stenosis or neural foraminal stenosis."

(A.R. 1281.)  Further, there was mild disc height loss, disc desiccation at the L3-L4 level without neuroforaminal stenosis or central spinal stenosis, and no evidence of spondylolisthesis at any level.  (*Id.*)  The disc characteristics of the remainder of the lumbar above L3-L4 was normal.  (A.R. 1282.)  Dacre's impression was that the low back pain was of unclear origin and no issues were "likely surgical."  (*Id.*) Dacre again recommended physical therapy.  (*Id.*)

### 4.  *Bridger Orthopedic and Sports Medicine*

Ryan received treatment for carpal tunnel and a laceration to her right index finger from multiple physicians at Bridger Orthopedic and Sports Medicine.

Dr. Vinglas examined Ryan for a laceration to the right finger with possible tendon damage on September 26, 2016.  (A.R. 1479-1482.)  Vinglas noted that the finger was "healing well with no sign of tendon damage," but recommended surgical repair of the ulnar digital nerve simultaneous to Ryan's right carpal tunnel release surgery, as well as ordered a nerve conduction study (EMG).  (A.R. 1479, 1482.)  Ryan had her stitches removed and an EMG with Dr. Gene A. Slocum on October 4, 2016.  (A.R. 1476.)  The tests indicated mild carpal tunnel and a damaged ulnar digital nerve.  (*Id.*; *see also* A.R. 1471.)

Ryan underwent surgery on October 20, 2016.  (A.R. 1462-1463, 1647-1648.)  Three weeks post-op, Ryan showed improvement with pain controlled, numbness in the index finger with sensation improving, and edema improving.

(A.R. 1455.)  Six-weeks post-op, Ryan complained of numbness in her right index finger, but she denied numbness in her other fingers.  (A.R. 1447.)  By January 2017, Ryan's chief complaint was decreased range of motion and sensation in the finger, but Dr. Vinglas found that she had "no limitations in function related to the impaired sensation" and noted Ryan felt "that the sensation has been improving over time."  (A.R. 1434, 1436.)  Vinglas also noted that the occupational therapy had progressed well with Ryan regaining most of her sensation and range of motion.  (A.R. 1436.)  In May 2017, Vinglas noted that Ryan's pain had resolved, range of motion in the wrist was good, but numbness persisted.  (A.R. 1432.)

## C.    The ALJ's Findings

The ALJ set forth the eight-step evaluation process to consider Ryan's claim under 20 C.F.R. § 404.1594(f).  (A.R. 18.)

First, the ALJ found that Ryan had not engaged in substantial gainful activity.  (A.R. 19.)  Second, the ALJ determined from the medical evidence that since August 1, 2016, Ryan's medically determinable impairments included degenerative changes of the spine, degenerative and post-traumatic changes of the right foot/ankle, right shoulder rotator cuff tear, biceps tendinosis and arthritis, diabetes, asthma, and anxiety disorder.  (*Id.*)  The ALJ determined that these impairments were severe but found that Ryan's carpal tunnel syndrome and right index finger conditions (laceration and ulnar digital nerve) were non-severe.  (*Id.*)

14

The ALJ then found that these impairments or combination of impairments did not equal the severity of the listings in 20 C.F.R. Part 404, Subpart P, App. 1.  (A.R. 20.)  Third, the ALJ found that medical improvement had occurred as of August 1, 2016 by virtue of "a decrease in medical severity of the impairments present at the time of the CPD."  (A.R. 22.)  Fourth, the ALJ determined that Ryan's medical improvement was related to her ability to work.  (A.R. 23.)

Because medical improvement related to Ryan's ability to work, the ALJ moved to step six and found that Ryan continued to have a severe impairment or combination of impairments which cause more than minimal limitations on her ability to perform basic work activities.  (*Id.*)  At step seven, the ALJ determined Ryan's residual functional capacity ("RFC") could perform sedentary work, with some restrictions.  (*Id.*)  The ALJ next found that Plaintiff was unable to perform her past relevant work because it exceeded her current RFC.  (A.R. 29.)  At the last step, the ALJ considered Ryan's age, education, work experience, and RFC to find that she has been able to perform a significant number of jobs in the national economy since August 1, 2016.  (A.R. 30.)  Therefore, the ALJ determined that Ryan's disability ended on that date and found she is "not disabled."  (A.R. 31.)

## IV.   Discussion

Despite Ryan's presentation of issues at the outset of her opening brief, the Court has had some difficulty identifying corresponding arguments in briefing.

15

(*Cf.* Doc. 9 at 5, 10-11 and 12-13, 15-28.)  Liberally construing Ryan's opening

brief, it appears she argues the ALJ erred in the following ways: (A) failing to

consider all impairments as severe, including cervical spine stenosis, carpal tunnel,

and ulnar nerve damage (Doc. 9 at 12); (B) finding that medical improvement

occurred between the comparison point decision and August 1, 2016 (*Id.* at 12-13,

15-17, 18-20); (C) discounting the credibility of Ryan's testimony (*Id.* at 8, 11, 13,

20); and (D) failing to properly evaluate the opinions of Ryan's treating physician,

Dr. Lange (*Id.* at 26-27).  The Court will address each issue in turn.

### A.   Severity of Impairments

Ryan argues that the ALJ failed to consider all her impairments as severe,

including cervical spine stenosis, carpal tunnel, and ulnar nerve damages.  (*Id.* at

12.)

The Court finds the ALJ's severity determination is supported by substantial

evidence.  The ALJ found several of Ryan's current impairments to be severe:

degenerative changes of the spine (including cervical stenosis), post-traumatic

changes of the right foot/ankle, right shoulder rotator cuff, biceps tendinosis,

arthritis, diabetes, asthma, and anxiety disorder.  (A.R. 19.)  But the ALJ found

Ryan's carpal tunnel and right index finger conditions to be non-severe because

treatments ultimately resulted in recovery as of the ALJ's hearing decision (July 5,

2018).  (A.R. 19-20.)  The ALJ found that these injuries resolved after testing,

16

treatment, and surgery and, further, that the symptoms resolved before the 12-month duration requirement was satisfied.  (A.R. 20.)  These findings are supported by Dr. Vinglas's observations contained in the record.  (A.R. 1432-1435, 1447, 1455, 1471, 1476, 1479-1482.)

### B.    Medical Improvement

Ryan argues that the ALJ erred in finding medical improvement from the comparison point decision.  (Doc. 9 at 16-17.)  The Commissioner asserts that the ALJ's finding of medical improvement was reasonable because Ryan received treatments and surgeries for her complaints, pain was adequately controlled with medication, and she experienced positive results "with respect to Plaintiff's muscle strength, sensation, range of motion, and pain during physical examinations and physical therapy treatments."  (Doc. 10 at 14-15.)

While it does not appear the Ninth Circuit has considered the issue, other circuit courts and district courts in the Ninth Circuit have held that the ALJ's finding of medical improvement must based on a comparison of the medical evidence at the time of comparison point decision with the claimant's current medical evidence.  See e.g., *Bryon v. Heckler*, 742 F.2d 1232, 1236 (10th Cir. 1984) ("In order for evidence of improvement to be present, there must also be an evaluation of the medical evidence for the original finding of disability."); *Veino v. Barnhart*, 312 F.3d 578, 587 (2nd Cir. 2002) ("In the absence of early medical

records, the administrative record lacks a foundation for a reasoned assessment of whether there is substantial evidence to support the Commissioner's finding that [the claimaint's] 1997-1998 condition represents an 'improvement.'"); *Vaughn v. Heckler*, 727 F.2d 1040, 1043 (11th Cir. 1984) (ALJ was "required to evaluate the medical evidence upon which [the claimant] was originally found to be disabled."); *Letitia S. v. Comm'r of Soc. Sec.,* 2020 WL 113082 (W.D. Wash Mar. 9, 2020) ("the ALJ's finding of medical improvement must be based on a comparison of the CPD's medical evidence with the current medical evidence pertaining to the continuing disability review."); *Zutphen v. Colvin*, 2016 WL 5358589, at *5–6 (N.D. Cal. Sept. 26, 2016) ("the Act does not authorize an ALJ to find medical improvement without making the comparison of prior and current medical evidence."); *Harville v. Comm'r of Soc. Sec.*, 2018 WL 4737263, at *5 (E.D. Cal. Sept. 28, 2018) (ALJ must consider the underlying record supporting the comparison point decision in determining medical improvement.).

These authorities are consistent with the plain language of the regulations. As discussed above, 20 C.F.R. § 404.1594(c)(1) provides that medical improvement will be "determined by a comparison of prior and current medical evidence …" Further, 20 C.F.R. § 404.1594(b)(7) states "[f]or purposes of determining whether medical improvement has occurred, we will compare the current medical severity of that impairment(s) which was present at the time of the

18

most recent favorable medical decision that you were disabled or continued to be

disabled to the medical severity of that impairment(s) at that time."

Here, the ALJ did not make any comparison of the medical evidence that

existed when Ryan was found disabled in 2012 with the current medical evidence.

While the medical records from the 2012 decision are included in the record, the

ALJ does not reference any of the records in his decision.  In fact, the ALJ made

clear he did not consider medical records prior to the alleged onset date of the

current decision (August 1, 2016) to be relevant, stating that any mention of the

medical evidence prior to the alleged onset date was "intended as background

only."  (A.R. 24.)

Rather than discussing and comparing the medical evidence from the

comparison point decision, the ALJ appears to rely on the fact that Ryan was

previously found disabled because she met the listing for disorders of the spine,

and the ALJ determined that she no longer did so.  (A.R. 23, 27.)  This finding may

support a determination that medical improvement is related to the claimant's

ability to work at step four.  See 20 C.F.R. § 404.1594(c)(3)(i) ("if medical

improvement has occurred and the severity of the prior impairment(s) no longer

meets or equals the same listing section used to make our most recent favorable

decision, we will find that the medical improvement was related to your ability to

work.")  But that section does not provide a basis to determine that medical

improvement has occurred. *Veino*, 312 F.3d at 587.  In *Veino*, the Second Circuit

rejected the argument that a finding that a claimant no longer qualifies for a listing

establishes medical improvement.  The circuit court pointed out that §

404.1594(c)(3)(i) "presupposes medical improvement," and "does not provide a

basis for finding improvement." *Id.*  The question of whether Ryan has

experienced medical improvement and whether any such improvement relates to

his ability to work "are analytically separate." *Lee v. Astrue*, 2012 WL 928741 at

*6 (E.D. Cal. Mar. 19, 2102).  The issues are considered at different steps in the

eight-step analytical process; "indeed . . . the ALJ only evaluates whether medical

improvement relates to the claimant's ability to do work at step four of the analysis

if he or she found medical improvement at step three of the analysis based on a

comparison of the prior and current severity of the impairments at issue." *Id.*

Therefore, the ALJ's finding in this action that Ryan no longer meets a

listing does not independently establish medical improvement.  The ALJ applied

an incorrect legal framework to consider the issue of medical improvement at step

three.

On remand, the Commissioner must follow the direction of § 404.1594(c),

compare the medical evidence that existed at the time of the comparison point

decision with her current to her current medical evidence, and determine whether

20

"there have been changes (improvements) in the symptoms, signs or laboratory findings associated" with Ryan's impairments.

### C.     ALJ's Evaluation of Ryan's Testimony

Ryan contends that the ALJ erred in "improperly finding [Ryan's] testimony not credible." (Doc. 9 at 13, 20.) The Commissioner argues that substantial evidence supports the ALJ's conclusion that Ryan was not a reliable source of her limitations. (Doc. 10 at 10-12.)

The Ninth Circuit has established a two-step analysis to determine the extent to which a claimant's symptom testimony must be credited. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective evidence of an impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* Second, if there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if he provides "specific, clear and convincing reasons" for doing so. *Id.* "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Reddick v. Chater*, 157 F.3d at 722 (quoting *Lester*, 81 F.3d at 834)). *See also Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015). The clear and convincing standard "is not an easy requirement to meet: '[It] is the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995,

1015 (9th Cir. 2014).

An ALJ may take the lack of objective medical evidence into consideration in assessing a claimant's testimony.  *Baston v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004).  But the ALJ may not reject the claimant's statements about the intensity and persistence of their pain or other symptoms "solely because the available objective medical evidence does not substantiate [the claimant's] statements."  20 C.F.R. § 404.1529(c)(2).

Here, the ALJ found that Ryan's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (A.R. 28.)  The ALJ did not address malingering, thus the Court presumes it is a non-issue.  Therefore, the ALJ was required to present clear and convincing reasons for discounting Ryan's testimony.  The Court finds the ALJ failed to do so.

The ALJ found that "[t]he evidence suggests that the claimant is not as limited in her overall functioning as she alleged," finding "the functional restrictions alleged by the claimant are disproportionate to the clinical findings in the medical evidence record."  (A.R. 26, 29.)  In making this finding, the ALJ outlined Ryan's testimony as to her limitations, which included: numbness and weakness in her right arm and hand; lifting was limited to 10 pounds; weak legs limiting standing to 15 minutes; sitting limited to 20 minutes; unprescribed use of a cane for ambulatory assistance; spine-related pain requiring supine position for 30

minutes 3 to 4 times per day; difficulty concentrating and comprehending information; and anxiety around crowds. (A.R. 24.) These limitations correlate to Ryan's impairments relating to her spine, foot/ankle, shoulder and arm, arthritis, attention deficit disorder, anxiety disorder, migraine headaches, diabetes, and asthma. (*Id.*)

In discounting this testimony, the ALJ generally referred to some of Ryan's treatment records. For example, the ALJ noted that Ryan reported in January 2017 that her pain medications "offered enough pain relief." (A.R. 26.) He also referred to treatment records in January and February of 2017, which recorded a "largely normal," physical examination, that Ryan "was in no apparent distress," and "the record noted only mild decreased range of motion of the lumbar spine … a normal gait, no abnormal pain behaviors, no muscle spasms, and normal muscle strength." (*Id.*) The ALJ also found the "diagnostic evidence was not every significant," pointing to a February MRI showing Ryan's L5-S1 fusion appearing solid, but with "increasing degenerative changing at L3-L4 without evidence of focal herniation." (*Id.*; *see also* A.R. 1287.) The ALJ additionally noted that Ryan reported improvement in her lower back pain in March 2017, but also noted that her leg numbs after 10 minutes of sitting. (A.R. 26; *see also* A.R. 1312.) Then in October and November 2017, the ALJ notes that Ryan felt "very well in general" and her pain was adequately controlled. (A.R. 27; *see also* A.R. 1596, 1615.)

23

From this, the ALJ said this "evidence suggests that [Ryan] is not as limited in her overall functioning as she has alleged."  (A.R. 26.)  It is not apparent to the Court, however, which specific physical limitations to which Ryan testified are disproportionate or discredited by the medical records.  The ALJ fails to link the records he refers to with Ryan's stated limitations, and thus does not provide specific, clear, and convincing reasons to discount Ryan's testimony relating to her limitations.

In *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015), the Ninth Circuit held an ALJ fell short of providing specific, clear, and convincing reasons for rejecting a claimant's testimony by merely reciting the medical evidence in support of his residual functional capacity finding.  The Court explained that summarizing a medical record "is not the same as providing clear and convincing *reasons* for finding the claimant's symptom testimony not credible."  *Id.* at 494 (emphasis in original).  The Ninth Circuit also emphasized that the ALJ must identify specifically *which* of the claimant's statements he found not credible and *which* evidence contradicted that testimony.  *Id.* at 493-494.

Here, the ALJ failed to set out which of Ryan's statements he found to be not credible and which evidence contradicts that testimony.  Without the required specificity, the Court cannot meaningfully review the ALJ's decision to determine whether the ALJ arbitrarily discredited Plaintiff's testimony.  *Thomas v. Barnhart*,

278 F.3d 947, 958 (9th Cir. 2002) ("[T]he ALJ must make a credibility

determination with findings sufficiently specific to permit the court to conclude

that the ALJ did not arbitrarily discredit claimant's testimony."); *Brown-Hunter*,

806 F.3d at 492 ("[A]lthough we will not fault the agency merely for explaining its

decision with 'less than ideal clarity,' . . . we still demand that the agency set forth

the reasoning behind its decision in a way that allows for meaningful review.")

(citation omitted).

Therefore, because the ALJ failed to point to the specific parts of Plaintiff's

testimony he found not credible, the ALJ erred.  *Brown-Hunter*, 806 F.3d at 494.

*See also Mangat v. Colvin*, 2017 WL 1223881, *5 (S.D. Cal. Feb. 3, 2017) ("The

ALJ failed to point to specific parts of Plaintiff's testimony he discredited.  This

error alone is fatal to the ALJ's credibility determination.").

In addition to the medical records, however, the ALJ also pointed to Ryan's

level of physical activities, such as riding a bicycle, camping and otherwise

exercising, as suggesting "that the claimant is capable of a reduced range of

sedentary exertional activity."  (A.R. 22, 29.)  Daily activities can be considered in

assessing a claimant's credibility.  20 C.F.R. § 404.1529(c)(3)(i).  "Where

claimant's ability to engage in activity is inconsistent with her asserted limitations,

the activity bears upon claimant's credibility."  *Vick v. Comm'r of Soc. Sec.*

*Admin.*, 57 F. Supp. 2d 1077, 1086 (D. Or. 1999), aff'd sub nom. *Vick v. Halter*, 5

F. App'x 781 (9th Cir. 2001); *Reddick*, 157 F.3d at 722.  But where the activity is in harmony with claimed disabilities, "the activity does not necessarily indicate an ability to work." *Id.*  Thus, daily activities are not necessarily inconsistent with a claimed disability, because "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

The Ninth Circuit recently reaffirmed these principles, stating "[w]e have repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability." *Weirick v. Saul*, _____ Fed.Appx. _____, 2020 WL 5362091 at *2 (9th Cir. Sept. 8, 2020) (internal quotations omitted).  In order to make an adverse credibility determination based on a claimant's daily activities, "[t]he ALJ must make specific findings relating to [the daily] activities and their transferability to a work setting …" *Id.*  (Internal quotations omitted).

The ALJ did not make specific findings as to whether Ryan's activities are transferable to a work setting, as the Ninth Circuit has instructed.  Instead, the ALJ simply concluded that since Ryan testified to riding a bicycle, camping, or exercising, as directed by her treating physicians, then she must be able to engage in a sedentary level of work.

Therefore, the Court finds the ALJ fell short of providing specific, clear, and convincing reasons for rejecting Ryan's testimony based on her daily activities. Upon remand, the ALJ must make specific findings as to whether Ryan's activities are in harmony with her alleged symptoms or whether those activities are transferable to the work setting.

### D.      Physician Testimony

Ryan argues the ALJ erred in weighing the opinions of her treating physician, Dr. Stephanie Lange. (Doc. 9 at 26-27.)  The Commissioner argues that the ALJ provided legally sufficient reasons to discount Dr. Lange's opinion.  (Doc. 10 at 16-19.)

"The opinion of a treating physician is given deference because '[she] is employed to cure and has a greater opportunity to know and observe the patient as an individual.'"  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). "However, the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability."  *Id.*  See also, *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) ("Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability.").  If the treating physician's opinion is not

well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the record, it is not entitled to controlling weight. *Orn v. Astrue*, 495 F.3d 625, 631-32 (9th Cir. 2007) (quoting Social Security Ruling 96-2p).

But even when a treating physician's opinion is not entitled to controlling weight, the ALJ must nevertheless also consider the factors listed in 20 C.F.R. § 404.1527(c) to determine what weight to accord the opinion. *Trevizo v. Berryhill*, 871 F.3d 664, 676 (9th Cir. 2017); *see* Social Security Ruling 96-2p (a finding that a treating physician's opinion is not well supported or inconsistent with other substantial evidence in the record "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527."). The factors include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; (5) the specialization of the treating source; and (6) any other factors brought to the ALJ's attention that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6); *Trevizo*, 871 F.3d at 675.

Opinions of treating physicians may only be rejected under certain circumstances. *Lester,* 81 F.3d at 830.  To discount an uncontradicted opinion of a treating physician, the ALJ must provide "clear and convincing reasons." *Id.*  To discount the controverted opinion of a treating physician, the ALJ must provide "'specific and legitimate reasons' supported by substantial evidence in the record." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012); *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Reddick*, 157 F.3d at 725.

In this case, the ALJ did not rely on the contradictory opinion of any other physician to discount the opinions of Dr. Lange.  The ALJ did mention that the state agency medical consultants had found that Ryan could perform light level exertional activity.  (A.R. 29.)  But the ALJ gave these assessments little weight. (*Id.*)  An ALJ cannot reject the testimony of a treating physician because of a contradictory opinion of a non-treating, non-examining physician, unless he "gives specific, legitimate reasons for doing so, and those reasons are supported by *substantial record evidence*." *Lester*, 81 F.3d at 831 (emphasis in original).  Here, the ALJ did not do so.  Therefore, Dr. Lange's opinions are uncontroverted, and the ALJ must provide clear and convincing reasons to discount her opinion.  The Court finds the ALJ failed to do so.

Dr. Lange conducted a comprehensive examination of Ryan on September 12, 2016, and subsequently provided a treating source statement dated September 28, 2016. (A.R. 1212-1217, 1255.) Lange stated that Ryan had been under her care since 2012. (A.R. 1255.) She said that Ryan's ability to work had not improved over the past several years. (*Id.*) She outlined her findings that Ryan continued to experience significant chronic pain related to disc disease of her cervical and lumbar spine, with associated radicular symptoms. (*Id.*) Lange also said that Ryan continued to experience "persistent right neck pain with radiation to the right shoulder, associated weakness, numbness and tingling in the hand with overuse." (*Id.*) She said Ryan also "struggles with chronic right ankle pain and instability following fracture and operative reduction and fixation." (*Id.*) Lange further relayed specific physical limitations, including increased pain with heavy or repetitive lifting, twisting, or frequent bending, and that she was unable to tolerate sitting or standing for extended periods. (*Id.*) Lange also noted that Ryan had limited education and had only been employed in the past performing manual labor. (*Id.*)

The ALJ accorded little weight to Dr. Lange's opinions. (A.R. 26.) He first found her opinion that Ryan's ability to engage in work activity had not improved "touches on issues reserve for the commissioner." (*Id.*) He also said that Lange's statement regarding Ryan's sitting and standing limitation was not sufficiently

specific as to the level of limitation.  (*Id.*)  Finally, he stated that Ryan's inability to perform manual labor was taken into consideration in the RFC, which only required sedentary exertional activity, and said that other limitations had also been addressed in the RFC.  (*Id.*)

These are not clear and convincing reasons for rejecting Dr. Lange's opinions.  With respect to the first reason, while the ALJ is not bound by Lange's opinion on the ultimate issue of disability, he may not simply reject the opinion without presenting legitimate reasons for doing so.  *Hill v. Astrue,* 698 F.3d 1153, 1160 (9th Cir. 2012).  In *Hill*, the ALJ did not consider an opinion of an examining psychologist who found that the claimant's impairment "makes the likelihood of sustained full time competitive employment unlikely."  *Id.* at 1159.   The Commissioner argued on appeal that the ALJ's failure to consider the opinion was harmless, because "an opinion that an individual cannot work is an opinion on an issue reserved to the Commissioner and, therefore, it is not binding."  *Id.* at 1160. The Ninth Circuit rejected that argument, and found that the opinion was "an assessment, based on objective medical evidence, of [the claimant's ] *likelihood* of being able to sustain full time employment. . . ."  *Id.* (emphasis in original).  The court found the ALJ should have considered the opinion, and his failure to do so was not harmless error.  *Id.*

The same is true here.  Dr. Lange's opinion that Ryan's ability to work has not improved over the last several years is not a conclusory statement, but an opinion based upon Lange's many consultations and examinations, and her extensive care and treatment of Ryan's many medical impairments over a period of five years.  It is an opinion the ALJ cannot simply dismiss as one reserved for the Commissioner.

In addition, the ALJ's finding that Dr. Lange's opinion that Ryan cannot stand or sit for an extended period is not sufficiently specific is not a legitimate reason to dismiss the opinion.  The opinion that she cannot stand or sit for an extended period is not so imprecise that it cannot be considered.

In *Aukland v. Massanari*, for example, the Ninth Circuit evaluated a similar situation where a treating physician provided an opinion that the claimant had "difficulty with standing or sitting for long periods because of his back disease." *Aukland v. Massanari*, 257 F.3d 1033, 1036-1037 (9th Cir. 2001).  While the Ninth Circuit found the opinion lacked detail, "it nonetheless provided the ALJ with evidence of a significant non-exertional limitation."  *Id.* at 1037.  The court held that "[u]nless discredited, a medical opinion regarding [the claimant's] inability to sit or stand for prolonged periods would require the assistance of a vocational expert in deciding whether there are significant number of jobs in the national economy … since most sedentary jobs require sitting for most or all the day."  *Id.*

(emphasis added) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1103 (9th Cir. 1999));

*see also* SSR 83-12 (S.S.A. 1983) (using the term "prolonged sitting" when

discussing the need to alternate between sitting and standing positions at a

sedentary level of work).  Here, the opinion that Ryan cannot sit or stand for an

extended time is no less specific than an opinion that a claimant cannot sit for

"long periods" or for "prolonged periods."  Moreover, Ryan's standing and sitting

limitations are well documented in the record (*see e.g.* A.R. 875, 916, 1194, 1283,

1309 & 1312), as well as Lange's opinion in 2011 that Ryan is not able to sit or

stand for more than one hour.  (A.R. 873.)

Finally, the fact that the RFC is limited to sedentary work, or that RFC

incorporates certain limitations recognized by Dr. Lange, is not a reason to

discount her opinion.  Indeed, the fact that some of her recommended limitations

are included in the RFC tends to support the validity of those limitations.  Further,

limiting the RFC to sedentary work is neither reason to discount Lange's opinion,

nor does it account for the sitting and standing limitations she found.  As the Ninth

Circuit recognized in *Aukland* above, an individual performing sedentary work is

generally required to sit for most or all of the day.  *Aukland*, 257 F.3d at 1037.

In addition to the above, even if the ALJ determined that Lange's opinion is

not entitled to controlling weight, he was still consider the factors listed in 20

C.F.R. § 404.1527(c) to determine the weight to accord Lange's opinion.  He did

not do so.  As the Ninth Circuit found in *Trevizo*, "[t]his alone constitutes reversible legal error."  *Trevizo*, 871 F.3d at 676.

Therefore, the Court finds that the ALJ erred in determining the weight to be given to Dr. Lange's opinion.  Upon remand, the ALJ shall reconsider Lange's opinion and provide it appropriate weight consistent with this decision.

## V.    Remand or Reversal

Plaintiff asks the Court to reverse the ALJ's decision and either remand for additional administrative proceedings or grant her benefits.  (Doc. 9 at 10, 24.) "[T]he decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court."  *Reddick*, 157 F.3d at 728.  If the ALJ's decision "is not supported by the record, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'"  *Hill*, 698 F.3d at 1162 (quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004)).  "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded.  Where, however, a rehearing would simply delay receipt of benefits, reversal [and an award of benefits] is appropriate."  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).

The Court finds remand for further proceedings is appropriate.  On remand, the ALJ shall reconsider whether Ryan has experienced medical

improvement since the comparison point decision; reevaluate the extent to which Ryan's symptom testimony should be credited; and re-evaluate the weight to be accorded to Ryan's treating physician, Dr. Lange.

## VI.     Conclusion

For the foregoing reasons, the Court orders that the Commissioner's decision is **REVERSED**, and this matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

**IT IS ORDERED**.

DATED this 29th day of October, 2020.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge